By the Court. Sandford, J.
The defendant resists a specific performance of this agreement on various grounds. We will consider, first, the objections made upon the statute of frauds.
Before the revised statutes it was settled that the auctioneer, *96 in these public sales, is the agent of both the buyer and the seller, and that his entry of the name of the purchaser in his sales book, immediately on striking off the property to him, was a sufficient signing of the contract to bind the purchaser. (McComb v. Wright, 4 J. C. R. 659; Emerson v. Healis, 2 Taunt. 38; Rennys v. Proctor, 3 Ves. and B. 57; First Baptist Church v. Bigelow, 16 Wend. 28.)
The revised statutes require the note or memorandum of the contract to be subscribed by the party making the sale, or his •authorized agent. (2 R. S. 135, 8, 9, Champlin v. Parish, 11 Paige, 405.) Here the entry is subscribed by the auctioneer with his own name, without any reference to his character as agent. Does that suffice within the meaning of the statute ?
In our opinion it is sufficient. The rule of law which requires an agent to sign the name of his principal in the execution of instruments, is confined to writings under seal. (Evans v. Wells, 22 Wend. 324; Townsend v. Corning, 23 ibid. 435; Townsend v. Hubbard, 4 Hill, 351.)
The auctioneer’s entry in this instance furnishes the name of his principal, and although that name does not appear in the subscription, the intention to bind him and not the auctioneer personally, is perfectly plain, and makes it the contract of the principal.
Several objections are next made upon the entry itself. It is not denied that the entry contains the price of the property and the terms and times of payment, but it is contended that it does' not show by whom the lot is sold, nor what particular lot is sold, nor that it was struck off or contracted to the plaintiff.
As to the last objection, the entry “ 1 lot next adjoining, I. L. Pinckney, $1350,” in the position and connexion which it occupies in the sales book, signifies that I. L. Pinckney had become the purchaser of that lot. It is true, there is no word used which expresses in direct terms that he was the highest bidder, or that it was struck off to him, or that he had contracted to buy the lot. But all this is fully signified by what is entered upon the book. The entries can have no other meaning. The use of initials in the entry of the' plaintiff’s name does not impair the validity of the writing. It is not denied that the plaintiff is the person intended and the person to whom *97 the lot was struck off, nor is it even alleged that there is any other Pinckney who has the same initial letters of his Christian name. We therefore think there is no force in the objection that the sales book does not show the plaintiff to have been the purchaser.
Next, as to the point that it does not show what particular lot was sold to him. This is founded upon an alleged omission in the description of the lot. The whole entry, taken together, discloses that "the plaintiff bought a lot fronting on St. Mark’s Place, on the south, being the fifth lot from Avenue A (the intervening four lots appearing in the same entry), from 22 feet 6 inches to 23 feet front and rear, and 54 feet deep. The description, we think, is ample to identify and bound the lot sold, as one 22 feet 6 inches wide. Beyond that, the plaintiff could not, perhaps, claim a conveyance under the description, but to the lot of that width we think there is no difficulty in sustaining his claim, and he claims no more in his complaint.
The remaining objection is, that the entry does not give the name of the seller. In our opinion, there is enough proved, in connexion with the surname, to identify the person contracting, and that it is a case of misdescription of the Christian name. The land sold is described in the writing. It is conceded that William Hagadorn was the owner of the land, and employed the auctioneer to sell it. Bejecting the erroneous word “ John,” there is sufficient remaining upon the face of the auctioneer’s entry, in the name “ Hagadorn,” and the description of the property he proposed to sell, to demonstrate the party intending to contract. The parol evidence, therefore, becomes evidence of identity of the person. The seller, “ Hagadorn,” is ascertained by the, entry, his identity is shown by the conceded facts before mentioned, and the inapt or false designation “John” does not vitiate the contract. This is upon the maxim, “falsa demonstn'aüo non nocet; ” for illustration of which we refer to Jackson, ex dem. Dickson v. Stanley, 10 John. 133; Jackson, ex dem. Miner v. Boneham, 15 ibid. 226; and 2 Cow. & Hill’s Notes to Phill. Ev. 1368 to 1375.
The defendant’s next point is, that the auctioneer was an agent, with limited power, and had no authority to extend the *98 time for the payment of the ten per cent., nor to receive'it, or give a receipt for it three days after the sale.
The power of an auctioneer is, no doubt, special and limited. His authority to receive the stipulated deposit, which in this case was ten per cent., is not, nor could it be questioned. He receives the deposit not merely as the agent of the seller: he is bound to keep it for the indemnity of the purchaser, until the latter is enabled to look into the title proposed to be conveyed to him, and decide on its sufficiency, or until the lapse of the time limited for the’ purpose in fixing the day for the payment and security of the residue of the price.
The terms of sale in this case, as is customary, provided that the purchaser should pay ten per cent, on the day of sale. Was the auctioneer’s authority limited to receiving it on that very day ? His entry in his sales book had made a complete contract, by which the purchaser was bound, at all events, to take the lot at the price there set down. The seller had a right, undoubtedly, to make time of the essence of the contract, if he chose to do so.' As a general rule, time is not so essential in executory contracts for the sale of land as to work a forfeiture on the omission to pay at the day stipulated (Edgerton v. Peckham, 11 Paige, 352, 363), and until the seller does some positive act to make it essential, the buyer is at liberty to pay after the day. We find no warrant for the doctrine that the auctioneer’s authority to receive the deposit on a sale made by him, on the terms here expressed, “ ten per cent, on the day of sale,” is limited to receiving it on that day and on that day alone. Until notified to the contrary by the seller, and his authority to receive it thereby revoked, we see no good reason why it does not continue after the day of sale. We do not perceive that it differs in this respect from the authority of other agents empowered to receive money on the sales of land or other executory contracts.' It is a very common occurrence that executory contracts are made for the sale of lands, and left in the hands of agents tó receive payment. They provide for payment on fixed days, and almost universally they make the execution of a conveyance dependent upon the payment of the price at the times and in the manner stipulated. -We venture to say it *99 was never heard of that the principal in such contracts could refuse to convey because the agent had received a payment after the day stipulated, there having been no notice to him not to receive it, or other revocation of his authority.
The power of an auctioneer, in receiving the ten per cent., does not fall short of that of such agents for the collection of contracts made on private sales, and we think we are holding the rule quite strict enough in favor of sellers at auction, when we decide that, until notified by the seller after the day of sale that he repudiates the contract and revokes the auctioneer’s authority to receive the deposit, that authority continues in full force.
The stipulation for the payment of a per centage, by way of deposit, on the day of sale, is for the benefit of both the buyer and seller. The buyer, by complying with those terms literally, will put it out of the seller’s power to revoke the sale on the ensuing day by recalling the auctioneer’s authority to receive the deposit. If the buyer postpone the payment of the deposit till the next or a subsequent day, he does it at the peril of that contingency. The seller may in the meantime forbid the auctioneer to receive the deposit, and on a tender of it to himself personally, he may refuse it, on the ground that he'was entitled to have it received by the auctioneer on the day of sale. But we cannot hold that the auctioneer’s authority to receive it terminates absolutely on the day of sale, nor that it differs in this respect from the power of other agents authorized to receive money payable at a fixed day.
The convenience of business, a circumstance which courts should always regard where no principle of law interferes, seems to require an authority in the auctioneer even more extended than .that we have expressed. The quantity of real estate sold at public auction in this city is immense. A great many parcels are sold by one auctioneer in a single day: and when, as the fact sometimes occurs, he sells a hundred or more distinct parcels at a single sale, it is manifestly impracticable that all or » even a major part of the purchasers can pay their deposit to him on the day of sale. The convenience of all concerned in this great and increasing department of business would be sub-served by holding that each purchaser may pay his deposit in *100 twenty-four hours after the sale. When j udicial sales are made, there is a propriety in requiring an immediate deposit, so as to preclude sham bids made for the sake of delay.
Whether the principles of law will authorize the latitude we have suggested, we need not now decide. We are very clear, however, thatjhey do warrant us in deciding, that until prohibited by the seller, the auctioneer’s authority to receive the deposit continues after the day of sale. Its limit would probably be the time fixed for the completion of the purchase, for if the buyer neglect to pay the deposit after that period, the purchase may be deemed abandoned, and the auctioneer’s authority to act for the seller thereby terminated. There was no such lapse of time in this case as would impair his authority to receive the deposit.
The only remaining question is then presented—Did the defendant revoke the auctioneer’s authority before he received the deposit ? This was a point to be determined on the evidence. The defendant’s son testified positively that he notified the auctioneer, the day after the sale, not to receive the ten per cent. There is, on the other hand, strong negative testimony to show that the young man was mistaken as to the time when this notice was given. The referee had the advantage of seeing the witnesses, and observing their respective candor and intelligence, and we ought to be governed by that consideration where there is not a very decided preponderance of testimony against his conclusion. Forming our opinion on the printed testimony alone, we should probably have decided that the notice was given the day after the salé, but the preponderance in that direction is not so great as to justify us in overruling the report of the referee made with the advantage of the personal examination of the witnesses: and as he has decided that the notice was not given till after the payment of the deposit, the motion to set aside his report must be denied, and the judgment must be affirmed.